May it please the Court. Good morning, Your Honors. My name is Petra Brownlee, and I represent the defendant and appellant in this case, Elizabeth Johnson. With me today at Council's table is Michael Brownlee. At this time, if I may, I would like to reserve two minutes for rebuttal. Thank you. Your Honors, on appeal, Ms. Johnson asserted that the government failed to prove the loss amount for purposes of both the sentencing guidelines as well as restitution by a preponderance of the evidence. This morning, I would like to focus the Court's attention on that loss amount as it relates to the sentencing guidelines. Perhaps the best illustration of the problems with that loss determination can be gleaned from the valuation of the subject property in this case at $300,000. Because when the government sought to prove that this subject property was only worth to do this, since we have the law students here, and tell them a little bit about the case, because once you jump into this, if they don't have a background, they're going to wonder, what is she talking about, why did we ever go to law school. Right, okay, I didn't consider this audience, I considered 10 minutes, so okay, I'm happy to do that. The whole world is your audience. Okay, great, it's my forum then. My client was convicted of wire fraud and money laundering. She entered a plea of guilty to those two charges, and two separate charges were actually dismissed pursuant to the plea agreement. What my client is challenging on appeal is the calculation of the loss amount, because the higher that loss amount for sentencing guidelines, the higher her sentence is. So my client, the government bears the burden of proving the loss amount once it's disputed by a preponderance of the evidence. My client's position is that both for restitution purposes as well as for purposes of the sentencing guidelines, the government did not do that. And I was telling the court that the best illustration of the problems with this calculation is because of the subject property in this case. This subject property is unique. It's a 20-acre parcel of property that contains geothermal features. That means it has hot springs on it. It's an hour southwest of Jackson Hole, Wyoming. So my client wanted to develop a project where high-end clientele could come and enjoy the hot springs and enjoy, you know, the thermal energy benefits of those hot springs. The government's position is that this property is only worth $300,000. What I want to draw the Court's attention to, though, is that in approving that $300,000 value, the government only introduced triple hearsay testimony of an IRS agent and criminal investigator named Agent John Nielsen. John Nielsen presented the Court with testimony regarding certain real estate agents whose names are unknown. Well, just, I'm sorry, she, your client bought the, purchased the 20 acres of property with this apparent idea, and I say apparent, giving her every benefit of the doubt, but we know that that's probably, was part of her scheme in the fraud, to develop this hot springs and spa. She purchased it for $265,000 and immediately encumbered it with, for the amount of over $400,000. That's correct. She took out different mortgages and loans. Is that correct? That's correct, Your Honor. All right. And so then she was convicted. This was a very somewhat elaborate scheme because she needed an investor. She got Rulon Gardner, former Olympic gold medalist and wrestler, and sought him out, put some documents together that were fraudulent. She signed them, said this was going to be a win-win for him. There's no way he could lose. He went and talked to some people because based on the fraudulent and doctored documents that he got, that was his impression that he could invest. He got that advice. He invested. And then she immediately, or rather as part of this, started laundering the money and giving it to her family and other parts unknown. She was convicted. And now she's trying to say, at this point in time, if I understand your argument, and I want to make sure I understand it, that the loss amount, when the judge is trying to figure out how much she needs to pay and how much damage was done basically because of this fraud, he looks at the value of the property, correct? Correct. All right. And you're challenging right now whether his assessment of $300,000 was an abuse of his of the trial court's discretion. Is that correct? That's correct, Your Honor. And the basis that you're saying is because the trial court, who has quite a bit of discretion and can hearsay at a sentencing proceeding, correct, when he was presented with evidence ranging from basically $265 to $4.3 million that your client was trying to say it was worth much more because of these plans to make this, that the district trial court erred when he only assessed the value of the property at $300,000, right? Yes. All right. And exactly why did he err? I believe he erred, Your Honor, because there was no proof as to the value of this property. If you take the purchase price, your client bought it for $265. Correct. But that purchase price is in 2006. What the trial court needed to look at at the time of sentencing was the value of the $265,000 at the time of sentencing. Right. But the trial court's also somewhat constrained by what's in the record. Yes. And we have a lot of case law explaining that this doesn't have to be an exact science at this type of proceeding. So I'd like to back up one step, because you started your response to Judge Murgi's question by mentioning that there was what you called triple hearsay. Yes. Is it your contention that there was an error because the trial court incorrectly considered hearsay at this type of proceeding? No, Your Honor. That is not my contention. I didn't think so. Right. So in terms of the evidence, it seems to me that although there was a very broad range of values, as Judge Murgia has indicated, there was a purchase price of $265,000, and then there was almost immediately a mortgaging of the property at over $400,000. Somebody thought it was worth $400,000 by way of collateral. Is that right? Well, a lot of the $484,000 or some portion of the $484,000 had to do with interest. But yes, Your Honor's point is well taken. A lot of people believed that this property had value. Even Rulon Gardner stated that at sentencing. I think what's – The $265,000 was in 2006. Correct. What date would you affix to the mortgage, the $400,000? Well, that's a good question. Let's see. It would have been right after the loan was taken out. So it was encumbered by $484,000 right after they actually signed for the loan. And perhaps I'll get it – if I have time for rebuttal, Your Honor, I apologize. I don't have the exact date of when that amount was disbursed. But I believe that the $484,000 was disbursed immediately upon the loan closing because that amount was called for in the loan closing document. Okay. So when you come back, if you could have the date, that would be helpful to me. Yes. And what was the date of the sentencing? April 27, 2012. Thank you. Yes, Your Honor. Getting back to the value of the property because it is such a broad range, I think it's important to note, again, that Mr. Gardner stated that a lot of people believe this property had value. When Agent Nielsen testified about these real estate agents who thought that the property could be worth $200,000 to $300,000, he provided no information about these real estate agents. He could not tell for sure that these real estate agents took the geothermal features of the property into account. That's on record page – the record excerpts, page 26. He specifically says, well, I think they took them into account. And defense counsel says, why do you think that? And then his rejoinder is, because it contains the properties. Again, this property is unique. We have one appraisal, granted, it contemplates about 20 years out, but that appraisal is for $4.3 million. So when we take that, where we know someone actually took into account the geothermal features of the property, and we compare that with the $265,000, and when we consider that the $265,000 has no evidence that the tippets, who were the prior owners of the property, knew about the geothermal features, that they believed it had any value. Excuse me, you're arguing that the prior owners didn't know this property had geothermal  Is that what you're arguing? That's not my – I'm just saying we have no evidence of what their understanding as to the value was. We don't know that they could truly appreciate the value. I don't know. I mean, I guess it's just mere speculation, because Agent – No, but isn't it the definition of fair market value that a willing buyer and willing to do – in fact, did conduct a transaction in 2006 to the tune of $265,000? I think that would be good evidence of that, Your Honor, yes. But again, it was in 2006, and we don't know, for example, if the tippets needed some money fast, and so they wanted to sell this property to Ms. Johnson, who had people who were immediately willing to invest in the property. So the – what I would like to draw the Court's attention to, if I get nothing else out, is the Eighth Circuit's opinion in United States against Rivers, because I think in that case, the Eighth Circuit did an excellent job of explaining that the government's burden can be a bit heightened when they only seek to prove a property valuation through hearsay testimony. That's at 917 Federal 2nd 369, it's in 1990. And also I'd like to draw the Court's attention to the Eleventh Circuit's opinion in United States against Thompson, which is at 963 Federal Appendix 887. It's in the Eleventh Circuit at 2012. I'm out of times, Your Honor. Counsel, apart from arguing that had the property been fully developed, it could have been worth seven figures, did your client make any other argument or offer any other proof of its value? No, Your Honor. And our position is that the burden never shifted to our client. I understand that, but it wasn't a surprise to your client that this valuation was going to be at issue. Correct. The defense attorney did introduce what she deemed the bottom line of the appraisal of the $4.3 million. So she did introduce that to the Court. Thank you. Thank you, Your Honors. May it please the Court. My name is Amy Potter. I'm from the District of Oregon, and I'm representing the United States in this matter. The question here is did the District Court commit clear error in determining the loss in this case? The government submits it did not. The key issues on this appeal are the valuation of the property, the $484,000 of encumbrances, and the $100,000 loss to a second victim, Ms. King. With respect to the valuation of the property, as this Court previously noted, Ms. Johnson purchased the property in June of 2006 for $265,000. On approximately those same dates, she incurred two encumbrances. $165,000 was an encumbrance she incurred from the people she purchased the property. And then she got an additional $250,000 investment at that approximate time in June of 2006. Those eventually become the $484,000 encumbrances that are paid off. It's then in January of 2007 that she enlists Mr. Gardner and obtains the $1.2 million loan that goes to pay off those encumbrances. So in June of 2006, we have a property that's purchased for $265,000 and is encumbered by a little over $300,000 in encumbrances that are incurring interest up until the date that the property is transferred to West Coast and private equities for $1.2 million. I think Ms. Brownlee's focus is on the specific valuation based on the evidence that was offered regarding the development, the potential development of the property. I think that's where the 4.3 comes in. That I think there was evidence assuming that they would have been able to develop the property in such a way to really maximize the geothermal properties. An assumption I think that was made is that the property could be worth 4.3 over 20 years. Yes, Your Honor. That was an appraisal that was done during the investment process, and it did appraise the property over a 20-year period at $4.3 million. So did the district court commit error by not giving more weight to that testimony that was given or that evidence? No, the district court did not commit error. It considered that appraisal, and much like the defense attorney herself admitted during sentencing, it was based on extraordinary assumptions. It was not a legitimate appraisal of the value of the property on the date of sentencing, what a willing buyer would purchase the property for. It is a value over time, which included, as the sentencing transcript notes, the presence of buildings, which were not on the property on the date of sentencing, and a 20-year value using the geothermal energy. But, counsel, let's talk about the valuation dates or valuation figures that are a little more rooted in reality. Yes. Why is it wrong to look at the $485,000 figure? Somebody – what's the answer to the earlier question? Somebody thought it was worth that by way of collateral in early 2007. The $484,000 includes interest. So I think the proper consideration would be the value of the original loans, which would be about $400,000. Okay. And I think the record is somewhat unclear as to whether those investments were simply the value of the property, much like a mortgage on your house, or additional investments in the hope that the property would be turned around. But even if the Court were to arrive at a value of $400,000, it wouldn't change the ultimate enhancement in this case. I understand that, but my question is the first question. Why wouldn't we look at that? Was it error to not consider the $400,000 figure? I don't think it was error, given all the facts that were in the record. That was a fact in the record, that those encumbrances were there. The Court had that before it. It had the testimony of the agent. It also had the testimony of the victim. I recognize that's less reliable, but that the victim himself had been told the property was only worth $100,000 to $150,000 by real estate agents. And then we have the purchase price of the property, which is $265,000. Given all of that evidence, the Court arrived at a value of $300,000. But that's not all of the evidence, I don't think, because the Court also heard that, I think through the what your opposing counsel has described as triple hearsay, but nevertheless had evidence that some real estate agents had valued it at $200,000 or $300,000 in that neighborhood, and that those offers had not been accepted. They had received offers in that range that had not been accepted. So going back to the definition of fair market value, what a willing buyer would pay and what a willing seller would accept, since those offers were refused, why isn't that evidence that $300,000 was not the fair market value of the property? I think it actually is evidence that it's the fair market value. It's what someone would be willing to purchase. But it wasn't accepted, counsel. Exactly. So it strikes me as the antithesis of fair market value. What it appears that West Coast is doing is holding on to hope that it gets to a higher value, but we are charged with valuing the property on the date of sentencing. So it is absolutely true that West Coast Bank may in three years or two years get a higher purchase price, and that's what they're hoping for. That is common these days because of the declining market for banks and other investors to hold on to property. So what we have before the district court, and the only evidence he has, is offers that only a purchaser would only pay between $200,000 and $300,000. That testimony came through the IRS agent. So given that, given the purchase price of $265,000 and some brief testimony by the agent about the declining market, it was reasonable for the court to determine that the fair market value was $300,000. Well, what you're arguing now is that the court may have attached or reached out and grabbed the best evidence available to it. That's a different question than the question presented to us. I mean, what opposing counsel is arguing is that the government didn't introduce proper evidence, that you didn't meet your burden of proof. We believe we did meet the burden of proof by presenting evidence of the value. I think the Crandall case instructs this court or instructs district courts to look at differing ways to calculate value and to calculate loss. And in this case, there was no appraisal. None was conducted. So the government presented the evidence it had, which was the evidence of what a purchaser was willing to pay for the property. The district court did not commit clear error by relying on that and determining that that was an accurate assessment of the fair market value as of the date of sentencing. And some folks thought it was worth a lot more. They invested a million dollars or more in the property. I mean, and the party that purchased the property thought it was worth a lot more or at least arrived at a huge figure. Even if you took 400 and whatever it is, 84,000, and discounted it for present value, you'd probably come pretty close to that $300,000 or $400,000 figure. So we're just looking at overall the district court has got a job of just making a reasonable estimate of the value of the property with all those figures being bounced around. It arrived at 300,000. An IRS agent who rendered an opinion on the value of the property? The IRS agent testified about his conversations with a gentleman who worked for the real estate agents who had assessed the value of the property, and they had been willing to purchase it between – there were multiple real estate agents, it appears – they were willing to purchase it around the time of sentencing between $200,000 and $300,000. So there was that value. You're correct. There was the $484,000, probably closer to $400,000 at the time she originally purchased the property, which was another value. There was the $265,000 she actually paid. And then there was the appraisal of $4.3 million. But, of course, as the government sets out in its briefs and is made clear at the sentencing hearing, that's an extraordinary assumption based on a long-term investment, including buildings, none of which exist on the date of sentencing. I'd like to talk – ask you a question about Donna Lee King and the $100,000 that was ordered in restitution to her. Can you just tell me how Ms. King is a victim of either the crime charged in the indictment to which Ms. Johnson pled? I'm trying to figure out how the restitution comes about there. What we know from the record, Your Honor, is that Ms. King is an investor in this Hot Springs project. And we know that mostly from the pre-sentence report. An objection is made to the inclusion of the $100,000 at the time of the pre-sentence report. The government argues that it is part of the scheme to defraud because it is still an investor in that Hot Springs property. And what – There was no evidence of that at all. She's not listed in the indictment. I think the sentencing guidelines and then also our case law reflects that anybody who gets restitution for any offense has to have some, you know, evidence to support that. I mean, I think the first time we saw Ms. King was in the pre-sentence report. And there was just some reference that she was a church member and had invested in the property. But she's not listed anywhere else, is she? The pre-sentence report, Ryder, in response to the objections by the defense, indicates that the pre-sentence report, Ryder, reviewed Ms. Johnson's bankruptcy petition, and Ms. King is in fact listed as an investor in the Hot Springs project. That is the only additional evidence we have in the record that she is part of this general scheme to defraud, this general investment. We would, of course, submit that while there was an objection made to the PSR, the defense never raised it again in the sentencing memo or in front of the district  court. In fact, when asked by the district court, do you have any other objections, the defense attorney indicates only those that I've argued. And up to that point, she had not argued the Ms. King investment. So our first position is that it's waiver. Certainly, I recognize because it was not objected to at the sentencing hearing, the government did not present any additional evidence on the Ms. King transaction. So all we have is what's in the pre-sentence report and the response to the objections. There is no other discussion of Ms. King in the sentencing memorandums or before the district court. Or in the indictment. No, except to the extent we talk the indictment talks about a wire fraud scheme to invest in the Hot Springs project. And according to the addendum or the response, the objections to the PSR, she is listed as an investor in that project. Isn't this a violation of Hughley v. United States? I mean, are you familiar with that? I mean, it says that, I mean, how do you distinguish that from this? I would submit that under the Brock Davis case where it says that the MVRA includes restitution for any person involved in the scheme, which is a harm directly by the scheme, I would submit that Ms. King is part of the scheme to the extent that the entire transaction, the entire investment into the Hot Springs is permeated by fraud. It is part of the scheme to defraud. So as she's soliciting additional investors to try and keep the scheme afloat, she is continuing that scheme to defraud. We don't have any indication that Ms. King was the, was a victim of any misrepresentations, any fraud, right? Only what is contained in the pre-sentence report. And that is admittedly very limited, Your Honor. Okay. So she may have made a very poor investment. She may have made the mistake of not doing her homework about the status of this development project. But I don't see any evidence that she was defrauded. And that's my problem. I'm only trying to make sure that I give you every opportunity to respond to this question. Your Honor, my best response is that the defense did not continue with that objection. So the government felt that the objection was no longer standing to the PSR. And to the extent that there is no objection to the PSR, the district court need not make additional factual findings. So this is just the question. Did the probation report list a value on the property? The probation department indicated that the property had been purchased for $265,000 and that there had been an appraisal of $4.3 million. There was some confusion or error at the time. I believe the PSR was originally being prepared as to whether a credit was even due for that. The government does not dispute. It was collateral and there was – she definitely deserved a credit for that amount. But at the time of the pre-sentence report, the pre-sentence report writer was not giving her credit for that. So I don't think the pre-sentence report writer went as far as to find a specific value. If there are no further questions, we would submit that the district court did not commit clear error and the sentencing should be upheld. Thank you. May it please the Court. Your Honor, to answer your question, I don't think it's crystal clear from the record at the time when the property was valued at $484,000. But I will tell you that I do think it had to have been prior to February 2007. And I'm getting that just so Your Honor is aware on page 3 of the sealed pre-sentence investigation report. My note shows 2007. And I couldn't nail it down any further. I can't get any further than that. But I also want to just clarify something that opposing – yes, Your Honor. This figure is just one that has arrived at for purposes of restitution. This is for purposes of the sentencing guidelines. Guidelines. Correct, Your Honor. And was there an order for restitution? There was an order for restitution as well. Your Honor, restitution – And what was the amount of that? The amount for restitution purposes is $1.5 million approximately. I can get specific if Your Honor would like. And we did challenge that in the brief. I was just trying to draw the Court's attention today on the value as it relates to the sentencing guidelines. Counsel? Yes. Opposing counsel raised the point that under the sentencing guidelines, none of this will matter, right, unless your client can get this valuation to – you're looking to get below $1 million, basically. Is that right? Well, yes. But I – personally and as my client's attorney, I'm trying to get the true value of this property. I understand that, counsel. But if you don't prevail on this issue regarding the valuation of the property, will the King argument or the argument as to the consultant's fee make a difference? I believe that the argument taking into consideration the consultant's $51,000 that was paid out, as well as the payment of the encumbrances at $484,000, that those two combined will make a difference. Could I ask you about the consultant's fee? Yes, Your Honor. I think the issue there is that the victim claims that he received no benefit from the $51,000 spent by these consultants and the government's – well, and that's the issue. Was there value there? There was value there, Your Honor. Where? Because – okay. I'll direct the Court's attention directly. If you look at the record excerpts on page 29 of the sentencing, Mr. Gardner clarifies there is $85,000 that were paid to these consultants. To be clear, that's not what we're talking about, okay? So if you really read carefully Mr. Gardner's statements, he explains these consultants paid before he came on to the – excuse me, they conducted work before Mr. Gardner came on to the project. They gave them a business plan. They gave them an executive summary, which Mr. Gardner admits were worth something. He admits that these consultants truly knew what they were doing and that he got a business plan from them. He also stated that he got drawings and renderings, which would be like architectural drawings of potential value to the property. So basically, they take this subject property and they say, hey, Mr. Gardner, here's how to make it, you know, this million-dollar property that everybody is contemplating. And so – Your argument – forgive me for interrupting, Counsel, but it seems to me – I want to make sure I understand your argument. And it seems to me what you're really arguing is that the victim bought into this project and that if things had gone according to plan, as he understood they were going to go, this money would have been spent. It would have been spent, yes. Well, it was actually spent. This money, Mr. Gardner – As opposed to being caused by the fraudulent inducement to buy in in the first place. Correct. That's absolutely correct, Your Honor. This was not part of that. This $51,000, Ms. Johnson owed to the consultants to develop the property. She truly wanted to do this. I mean, I think personally the record shows that she invested $250,000 into this. This isn't a POMSE scheme. This isn't an ongoing fraud. No, but it was a fraud. That's been established. Yes, Your Honor. There was a wire fraud that happened. But my point is to distinguish it from, say, a telemarketing scheme where, you know, these monies are paid out to continue and to perpetuate a fraud. In that instance, no defendant should get credit for the money that's paid out. The business plan was delivered? The business – I believe that it was, Your Honor. If you read the sentencing transcripts, he states that he got those things. At 29 ER? Yes, Your Honor. I'll look. Thank you. Okay. Thank you. Did the district judge offer a description of the scheme? Of the scheme? Yes. I guess I don't. As to whether he believed my client thought the property would be developed? No, whether he believed there were a bunch of crooks. I think the only general consensus about who was a crook – well, Mr. Gardner certainly thinks that my client was, and she entered a plea. But then the consultants, is that how you mean, Your Honor, whether the consultants were crooks? The entire scheme that your client had? I don't remember him characterizing it as an ongoing fraudulent scheme. Perhaps he did. What was his sentence? What was the sentence? So the lawyers find out what's going on. Sure, yeah. What is going on? I'll tell you. My client was sentenced to 34 months' imprisonment on both counts, so the money that she was charged with was the entire fraud count. But those sentences are to run concurrently, so she'll only have to serve 34 months and probably not that. And she also has three years of supervised release to follow. And then, of course, the payment of restitution, which she'll pay out at 20 percent of her wages, and that's about $1.5 million. But if you're successful on your challenge on the loss amount, that would reduce the offense level computation by two or four levels? I'm trying to remember. I believe that it would reduce it by two, Your Honor. And that would reduce the range from? That reduces the range, I believe, from 19 to 17, which puts her, the maximum sentence she could receive, I believe, would be at 19 would be no, excuse me, she got 19. So at 17, the total amount of months she could get would be from 24 to 30 months. So that would knock down her sentence. Yes, Your Honors. Possibly. Possibly, of course. Yes. Thank you. Thank you very much for your time, Your Honors. Just a few comments for the benefit of the students. These are just my views. But these sentencing guidelines came into operation, oh, around 1980, 81. Before that, the trial judge had the ---- Can you hear me? Could you hear me before? If you have a problem, just raise your hand if you can't hear me. Can you hear me now? All right. In the good old days before we had these sentencing guidelines, which are, in my opinion, more complex than the Internal Revenue Code, it was a trial judge exercising his or her discretion within certain limits that are set out in the penal laws who would decide what the punishment should be. And so then there was a movement to some sort of uniformity in sentencing because one judge down the hall may impose a sentence, say, of two years, and someone on the other end of the hall, for what seemed like a similar offense, might impose a sentence for three or four years. Though, of course, each case is unique in a sense, considering background of people and the circumstances. So we got this idea, or somebody got this idea, that actually it was ---- Well, I won't mention any names. They're not with us any longer. And so we decided to have uniformity. So we developed this complex system of sentencing people, the net effect of which is to impose greater sentences on probably 90 percent of those who were in prison. And where the sentencing power in the real world was taken away from the judges and effectively transferred to the U.S. attorneys, to the prosecutor's office. You understand that? Is that clear to you? All right. And that's the system that we have with us today. It's been here now for well over 30 years. So a lot of folks are used to it and sometimes forget we had a much better system. One of these days I hope this system will collapse. The Supreme Court has already told us that the guidelines are unconstitutional. But in order to avoid congressional repercussions, also told us that even though they're unconstitutional, we can consider them for advisory purposes. But to do that, we have to go through a whole complex series of factors. I think they're 35-53. So they're with us and there are very few judges on the bench today who know of any other system. But, and as I said, I think the government will agree with me. They're more complex than the Internal Revenue Code. And our probation officers, instead of acting in the role of social workers, trying to get people rehabilitated and supervise them, all they do now, or most of them do, is sit in jail. Sit down and try to interpret all these complex rules. So you get big, thick pieces of report. And the idea of rehabilitation and helping people get back on their feet is really not considered an important factor. So think about that when you decide what you want to do in the future. Anyway, that's just my view, and I hope it changes. And that's the end of my comments.
judges: Pregerson, Murguia, Christen